## Jacob I. Shoemaker, Trustee, Appellant, *v.* The Mount Lookout Coal Company.

[Marked to be reported.]

*Mines and mining—Coal lease—Royalty—Selling price at the breaker—Sales agents' commissions—Usage.*

In an action by a lessor against a lessee for royalties, the lease provided as follows: "For all coal mined, taken out and disposed of above the size of pea coal, twenty-five cents per ton shall be paid when such coal sells at an average of two dollars per ton or less at the breaker; and when the said coal shall sell at the breaker at more than two dollars per ton, then the amount of royalty shall, for such time, be twenty per cent on the amount it shall sell for in excess of two dollars per ton, in addition to the said sum of twenty-five cents per ton." The evidence showed that the meaning of the phrase "selling price at the breaker," was by universal usage the actual selling price at the place of delivery, less the cost of selling, including commissions of

selling agents and the freight; that for several years the lessee paid an agent 15 cents per ton for making sales, which sum in the settlement of royalties, was always deducted from the selling price of the coal without objection on the part of the lessor. A new arrangement was then made by which the lessee sold directly to a coal company at a higher price, but in order to obtain the privilege of making the sales direct he had to pay the agent, who had a written contract for the sale of all the output of coal from these mines, 8 cents per ton for all coal sold to the coal company. *Held*, that the commission of 8 cents per ton was to be allowed as part of the expenses to be charged in determining the selling price of coal at the breaker.

Argued April 13, 1896.  Appeal, No. 63, July T., 1895, by plaintiff, from order of C. P. Luzerne Co., Dec. T., 1893, No. 53, overruling exceptions to referee's report. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ.  Affirmed.

Assumpsit to determine amount of royalties due under a coal lease.

Before L. H. Bennett, Esq., referee.

It appeared at the trial before the referee that on April 2, 1888, the plaintiff executed and delivered to James N. and Nicholas E. Rice a certain indenture of coal lease of all the merchantable coal upon and under a tract of land therein described, with the right to mine, remove and dispose of the same for their own use, benefit and advantage, for and during such period of time as shall be necessary to mine and remove all said merchantable coal that can be mined and removed by prudent and skillful mining, the lessees agreeing "for all coal mined, taken out and disposed of above the size of pea coal, twenty-five cents per ton shall be paid when such coal sells at an average of two dollars per ton or less at the breaker, and when the said coal shall sell at the breaker for more than two dollars per ton, then the amount of royalty shall, for such time, be twenty per cent on the amount it shall sell for in excess of two dollars per ton, in addition to the said sum of twenty-five cents per ton. . . . And the said lessees shall furnish the said lessor every three months with a full and true statement of the amount of coal and the various kinds thereof sold and shipped from said premises during the preceding quarter-year, and of the average market price of all the various kinds and sizes of coal during said quarter. . . Payment shall be made for one half of twenty-five thou-

sand tons on the first of October, 1888, and thereafter quarter-yearly, commencing on the said first day of October, 1888, at the end of each quarter from that date, for the full amount mined and taken out, but in no case is less than the minimum amount hereinafter named and provided for payment to be made each year, whether mined and taken out or not, except as hereinafter provided. The prices on the foregoing article fixed and agreed to be paid for said coal of the various sizes shall be based and paid upon a general monthly average of the said prices of said coal. . . . Not less than one hundred thousand tons and as much more as shall be mined from the said lands shall be paid for by the said lessees during each and every year of the continuance of this lease."

On March 7, 1892, the defendant contracted to sell to the Philadelphia & Reading Coal and Iron Company, in railroad cars at defendant's breaker all of the coal mined, prepared and shipped by it from that date, and all the coal was so sold up to March 31, 1893.

It appeared from the evidence that the average price per ton which the defendant received from the Philadelphia & Reading Coal and Iron Company for the year ending March 31, 1893, for breaker coal or coal about the size of pea coal, was $2.39586 or $0.39586 in excess of $2.00 per ton. The evidence showed that the defendant paid the plaintiff $25,000 for the year, and this suit was brought to recover twenty per cent upon the excess over $2.00 per ton on one hundred thousand tons, to wit: $7,917.20. The defendant controverted this claim by showing a contract of January 15, 1889, in which he had agreed to consign the entire coal product of this colliery to Williams and Peters, for sale by them, and to pay as a commission upon such sales 15 cents per ton for sizes above pea coal; and it appeared that the defendant in this contract had shipped this coal to said Williams and Peters and that they had sold it on said commissions until March, 1892. Defendant showed a further contract with Williams and Peters in which the latter had agreed to a suspension of the contract of January 15, 1889, and that the defendant might sell his own coal direct to the Philadelphia & Reading Coal and Iron Company, and the defendant in consideration thereof agreed to pay said Williams and Peters a uni-

form commission of 8 cents per ton on coal of all sizes thus sold, and that Williams and Peters ceased selling coal, but received from the defendant during the year ending March 31, 1893, said sum of 8 cents for each ton of coal sold by defendant to the Philadelphia & Reading Coal and Iron Company.

The referee's conclusions of law were as follows:

1. That the terms used in the first article of the lease in question, " and when the said coal shall sell at the breaker at more than two dollars per ton," taken in connection with the several covenants and provisions of that document, by legal intendment means, when the net price which the lessees receive for their coal (after deducting from the nominal price, as well commissions and expenses paid third persons in effecting sales, as freights and other charges) exceeds $2.00 per ton.

2. That in view of the original contract between the defendant and Williams & Peters, the further contract between them, and the facts and circumstances already set forth,—in ascertaining whether the defendant in this case (under the written contract of March 7, 1892, between it and the Philadelphia & Reading Coal and Iron Company), during the year ending March 31, 1893, sold its coal at the breaker at more than $2.00 per ton, and if so for how much more,—there should be deducted from the average prices paid by the purchaser company, as set forth in the schedule under the fifth finding of fact, the sum of 8 cents per ton for each ton thus sold as the cost of selling the same to the purchaser company, and this deduction being made, the average price for which the defendant sold its coal, above the size of pea coal, at the breaker, was two dollars thirty-one cents and five hundred and eighty-six thousandths of a cent ($2.31586).

3. That twenty per cent on the average amount more than $2.00 per ton for which the defendant thus sold its prepared coal at the breaker, is six cents and three thousand one hundred and seventy-two ten thousandths of a cent ($0.063172), which added to twenty-five cents per ton makes the maximum royalty payable under the lease of thirty-one cents and three thousand one hundred and seventy-two ten thousandths of a cent ($0.313172).

4. That the defendant is liable to the plaintiff in this action for the royalty on one hundred thousand tons of coal of

the size above pea coal at the maximum price per ton of

| | | |
|---|---|---|
| $0.313172, amounting to . . . . . | $31,317 | 20 |
| Less amount already paid on account . . | 25,000 | 00 |
| Balance . . . . . . | $ 6,317 | 20 |
| Plus interest from April 1, 1893, to Feb. 1, 1894, | 315 | 86 |
| Total . . . . . . | $ 6,633 | 06 |

5. That judgment should be entered for the plaintiff for $6,633.06.

Exceptions to the referee's report were overruled in an opinion by WOODWARD, J., and judgment was entered in accordance with the recommendation of the referee.

*Errors assigned* were in overruling exceptions to referee's report.

*William S. McLean,* for appellant.—There must be knowledge of the usage of both parties to the contract before the usage can be read into it, and made part of it: Corcoran v. Chess, 131 Pa. 356; Ambler v. Phillips, 132 Pa. 168; First Nat. Bank v. Fiske, 133 Pa. 241.

Evidence of the usage or custom of a particular class is inadmissible in construing a contract made with one not of that class: 27 Am. & Eng. Ency. of Law, 759; Brown v. Strimple, 21 Mo. App. 338; Long v. Armsby Co., 43 Mo. App. 253; Keavy v. Thuett, 47 Minn. 266; VanHoesen v. Cameron, 54 Mich. 609; Weld v. Barker, 153 Pa. 465.

*Thomas H. Atherton,* with him, *Everett Warren,* for appellee.

OPINION BY MR. JUSTICE GREEN, October 6, 1896:

The parties litigant in this case are in controversy over a single question of very narrow limits arising upon the construction of a coal mining lease. The question is whether a commission of 8 cents per ton is to be allowed as part of the expenses to be charged in determining the selling price of coal at the breaker. It is perfectly manifest that the literal meaning of the words employed in the lease is not the meaning of the parties. The subject of contention is the amount of royalty to

be paid to the lessor for coal mined under the lease. The words of the lease on this subject are, " For all coal mined taken out and disposed of, above the size of pea coal, twenty five cents per ton shall be paid when such coal sells at an average of two dollars per ton or less at the breaker."

The coal in large quantities is not sold literally "at the breaker," but at distant points of delivery, and the custom of the trade is, in determining what is the selling price "at the breaker," to deduct from the price received by the shipper the cost of selling and transporting of the coal to the point of delivery. The cost of selling is represented by the commissions paid to selling agents, who conduct a business of selling coal at tide water, and other points, for the producers, otherwise called operators. The selling agents are paid by a commission, varying from 25 to 10 cents per ton, according to the size and quality of the coal sold. In the present case the defendant was in the habit of selling the coal produced from their leased mines through a firm named Williams & Peters, under a contract in writing made with them dated January 15, 1889, at a commission of 15 cents for all sizes above pea, and 10 cents for pea and smaller sizes. In the settlements for royalty between the plaintiff and defendant these commissions were always deducted from the selling price of the coal together with the cost of transportation, in order to determine the selling price at the breaker, and that was the uniform habit of doing the business up until March, 1892. At that time a new arrangement in the coal trade was made by which many producers agreed with the Philadelphia & Reading Coal and Iron Co. to sell them all their coal upon certain terms agreed upon. For the year now in question, from March, 1892, to March, 1893, the defendant company sold its coal to the Reading Coal and Iron Company under a written contract . for that purpose. The purchase price was to be paid directly to the defendant company and the agency of Williams & Peters was suspended during that time. But Williams & Peters held a written contract for the sale of all the output of coal from . these mines, which covered the year in question, and they declined to surrender their contract. Finally they were induced to agree with the defendant company that they would suspend their rights under the original contract upon receiving from the

defendant a commission of 8 cents per ton on all coal sold to the Philadelphia & Reading Coal and Iron Company. This agreement was to continue for seven years from March 1, 1892, unless the defendant made default in the payments, and at the expiration of the term, or in the event of a default in the payments, the original contract was to be restored and remain in full force and effect.

It was in this state of the facts that the present question arose. Prior to the making of this new contract the original commissions of 15 and 10 cents per ton were always deducted from the selling price of the coal without objection on the part of the plaintiff. The freights were also deducted, and the resulting price was treated as the selling price at the breaker. Considerable testimony was taken to show that this was the uniform custom in all such contracts throughout the anthracite coal region and not a word of opposing testimony was taken. The plaintiff fared much better under the new arrangement than under the old, because the royalty which he received was increased by the difference between the new and the old rates. A better price also was obtained for the coal sold than under the old system and in that way also the royalty was increased. But the plaintiff desires also the 8 cents commission which the defendant was obliged to pay, and did pay, in order to obtain the privilege of selling. We know of no reason why this ungracious and unreasonable demand should be allowed. In strict construction of the words of the contract, if the deduction of commissions was allowed as part of the cost of selling the coal beyond the breaker, before the change was made, it was just as certainly a proper charge after that event. It still remained as a commission which had to be paid, and actually was paid, in order that the coal should be sold to the new purchaser. Williams & Peters were under no obligation to give up their contract, and if they choose not to do so except upon condition that a part of what they had originally received they should still receive, the part which they continued to receive was as much a lawful burden upon the selling price of the coal after, as before, the contract with them was made. Independently of that consideration the undisputed testimony showed that the meaning of the phrase "selling price at the breaker" was by universal usage, in which this plaintiff participated, the actual

selling price at the place of delivery less the cost of selling and the freight. We are of opinion that the referee and the court below were entirely correct in their disposition of the case.

Judgment affirmed.